Cadwell v. Higginbotham, 20 N. M. 482.

[No. 1764, July 10, 1915.]
[Rehearing Denied Sept. 7, 1915.]
CADWELL et al. v. HIGGINBOTHAM et al.

SYLLABUS BY THE COURT.

1. Where a proposed trial amendment to a complaint does not substantially change plaintiff's claim, it may, under leave of court, be properly made.

P. 495

2. In case of executory contracts for the sale and delivery of personal property, the remedy of the vendee to recover damages, on the ground that the article furnished fails to correspond with the contract, does not survive the acceptance of the property by the vendee after opportunity to ascertain the facts.

P. 496

3. Where a vendee of cattle, under a written contract, objects to receiving such cattle upon stated grounds, and receives them under duress, involuntarily, he cannot afterwards, in a suit for damages, set up, as a ground for recovery, defects in such cattle not called to the attention of the vendors at the time such cattle are accepted. The vendee must make known to the vendor, in some manner, the fact that such claimed defects exist, and that his payment of the purchase price would not be made because of such claimed

Cadwell v. Higginbotham, 20 N. M. 482.

defects, save for the pressing necessities which exist, and compel the payment in order to obtain possession of the property.

P. 497

4. Where the trial court has placed a reasonable construction upon a complaint, whose averments are susceptible of two constructions, the appellate court will be inclined to adhere to the construction given to the pleadings by the trial court.

P. 505

5. An appellee cannot, in the appellate court shift the grounds upon which his complaint proceeds and the judgment stands, and advance new theories to sustain the judgment of the lower court.

P. 505

6. When duress is exerted under circumstances sufficient to influence the apprehension and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary; but the circumstances of the case are always to be taken into consideration.

P. 507

7. Where A. contracts for the purchase of all the four and five year old steers owned by B., delivery to be made later, and by the terms of the contract A. is entitled to eliminate 15 per cent. of the herd, in order to cut out the unmerchantable cattle, and A. makes a substantial payment on the cattle at the time the contract is signed, and thereafter A. contracts to sell all said cattle to a third party, upon which he receives a payment of $50,000, and such third party is demanding a compliance with said contract by A., and the price of cattle has materially advanced since A. has contracted with the third party, and A. is unable to obtain other similar cattle to enable him to comply with his contract with such third party, all of which facts are known to B., and B., taking advantage of A.'s necessities, compels him to accept 300 head of under age cattle and 400 head of un-

merchantable cattle, in order to obtain possession of any of such cattle, and A., under protest, accepts and pays for such cattle, such facts make a case of legal duress of goods, and A. is not bound by his acceptance and payment.

P. 507

8. If goods be released on the promise of a third party to pay the charges against the same, and if such third party, instead of resisting payment, pay according to such promise, this does not prevent a recovery of the money back by the party for whom such payment was made, if he has reimbursed, or undertaken to reimburse, such third party for such payment.        P. 507

Appeal from District Court, Chaves County; Richardson, Judge.

Action by John S. Cadwell and another against J. M. Higginbotham and others. From a judgment for plaintiffs, defendants appeal. Reversed and remanded, with directions.

R. D. Bowers of Roswell and Renehan & Wright of Santa Fe, for appellant.

The court erred in permitting the plaintiffs to file, as a trial amendment, the second amended complaint, the same introducing a new cause of action.

Sub sec. 82, sec. 2685, C. L. 1897; Loretto Lit. Soc. v. Benevolent Soc., 136 Pac. (N. M.) 858; Candelario v. Miera, 134 Pac. (N. M.) 829; Bank v. Speed, 15 N. M. 1, 4; 31 Cyc. 409.

Money voluntarily paid, with knowledge of defects, cannot be recovered.

De La Cuesta v. Ins. Co., 136 Pa. St. 658, 9 L. R. A. 631; Harvey v. Girade National Bank, 119 Pa. 212; Peebles v. Pittsburg, 101 Pa. 304; McCrickart v. Pittsburg, 83 Pa. 133; London v. Buford, 148 U. S. 581; Oliver v. White, 122 Pac. 156; Lamborn v. County Com., 101 U. S. 191; Territory v. Newhall, 15 N. M. 147; Mann v. Gordon, 15 N. M. 659, dissenting opinion.

Cadwell v. Higginbotham, 20 N. M. 482.

As to legal duress, see,

Joannin v. Ogilvie, 49 Minn. 564, 32 Am. St. R. 581; Radich v. Hutchins, 95 U. S. 210; Florida Ath. Club v. Hope Lumber Co., 44 S. W. (Tex.) 10; Kilpatrick v. Insurance Co., 2 L. R. A. (N. S.) 574 (N. Y.) and case note; DeGraff v. Ramsey C., 46 Minn. 319; Brumagin v. Tillinghast, 18 Cal. 265, 79 Am. Dec. 176; Radich v. Hutchins, 95 U. S. 210; Wessel v. Land & Mtg. Co., 3 N. D. 160, 44 Amer. St.Reps . 529; Mariposa Co. v. Bowman, Fed. Cases No. 9089; Patterson v. Cox, 25 Ind. 261; Burke v. Gould, 105 Cal. 277, 38 Pac. 733; Savannah Sav. Bank v. Logan, 99 Ga. 291, 25 S. E. 692; Shuck v. B. & L. Assoc., 63 S. C. 134, 51 S. E. 28; U. S. v. Edmonson, 181 U. S. 500; Silliman v. U. S., 101 U. S. 465; Baker v. Cincinnati, 11 Ohio St. 534; Westlake v. St. Louis, 77 Mo. 47; Amer. Brewing Co. v. St. Louis, 187 Mo. 367, 2 Amer. & Eng. Ann. Cases 821 and note; Swift & Co. v. U. S., 111 U. S. 28; Ratterman v. Express Co., 49 Ohio St. 608; Vick v. Shinn, 49 Ark. 70, 4 Am. St. Rep. 26; see also: Claflin v. McDonough, 33 Mo. 412, 84 Am. Dec. 54; Fulham v. Down, 6 Esp. 26; Sheldon v. School Dist., 24 Conn. 88; Amesbury, etc., Mfg. Co. v. Amesbury, 17 Mass. 461; Preston v. Boston, 12 Pick. 14.

Inspection, acceptance and payment by plaintiffs preclude their right to recover in this case.

2 Mechem on Sales, sec. 1391; Talbot Paving Co. v. Gorman, 103 Mich. 403, 61 N. W. 655, L. R. A. 96; Parks v. O'Connor, 70 Tex. 377; Seay v. Dillen, 16 S. W. 642; Coplay Iron Co. v. Pope, 108 N. Y. 232, 15 N. E. 335; Thompson v. Libby, 35 Minn. 443, 29 N. W. 150; Waeber v. Talbot, 167 N. Y. 48, 82 Amer. St. Rep. 712; Parks v. O'Connor, 70 Tex. 377, 8 S. W. 104; Smith v. Rail Mill Co., 50 Ark. 31, 6 S. W. 225; Titley v. Enterprise Stone Co., 127 Ill. 457, 20 N. E. 21; Schopp v. Taft, 106 Iowa, 612, 76 N. W. 843; McCormick v. Sarsen, 45 N. Y. 265, 6 Amer. Rep. 80; see also: Pierson v. Crooks, 115 N. Y. 539, 22 N. E. 349, 12 Am. St. Rep. 831; and Williams v. Robb, 104 Mich. 242; 62 N. W. 352; Reed v. Randall, 29 N. Y. 358, 86 Amer. Dec. 305.

Business necessities do not constitute duress.

Silliman v. U. S., 101 U. S. 456; French v. Shoemaker, 14 Wall. 333; Goebel v. Linn, 47 Mich. 489, 41 Amer. Reps. 723; Page on contracts, art. 254-255.

The compulsion must have continued down to and have actually existed at the time of payment.

22 Amer. & Eng. Ency. (2d Ed.) 614; Savannah v. Feeley, 66 Ga. 31; Schultz v. Culbertson, 46 Wis. 313; Heckman v. Schwartz, 64 Wis. 48; Burke v. Gould, 105 Cal. 277; Cunningham v. Boston, 15 Gray, 468; Hablichtel v. Yambert, 75 Iowa, 530; Teem v. Ellijay, 89 Ga. 154.

Plaintiffs had an adequate remedy at law.

30 Cyc. 1311.

Protest cannot be enlarged beyond that made at the time of payment.

35 Cyc. 239; 30 Cyc. 1311; Fox v. Williamson, 14 L. R. A. (N. S.) 1107; Meek v. McClure, 49 Cal. 623; Ligioner v. Ackerman, 46 Ind. 552, 15 Amer. Reps. 323; Monongahela Nav. Co. v. Wood, 194 Pa. St. 47; Harvey v. Girard Nat. Bank, 119 Pa. St. 212.

There being no loss, there could be no damage.

Forsyth v. Palmer, 14 Pa. St. 97; Theiss v. Weiss, 166 Pa. St. 9, 45 Am. St. R. 638; Sedgwick on Damages (4th Ed.) 28, 29, 36, 37; Bussy v. Donaldson, 4 Dall (U. S.) 206.

REID & HERVEY of Roswell and SAM R. SCOTT of Waco, Texas, for appellees.

As to what constitutes duress, see Robertson v. Frank Brothers Co., 132 U. S. 17; Galusha v. Sherman, 105 Wis. 263, 47 L. R. A. 417; Vine v. Glenn, 1 N. W. 997; Nicoll v. Modern S. S. Co., 128 N. W. (Wis.) 72; Page on Contracts, sec. 1509; Lafayette & Indianapolis R. Co. v. Pattison, 41 Ind. 327; Fargusson v. Winslow, 34 Minn. 384;

Cadwell v. Higginbotham, 20 N. M. 482.

Brumagin v. Tillinghast, 18 Calif. 265, 79 Am. Dec. 176; State v. Nelson, 41 Minn. 25; Schooley v. Mumford, 60 N. Y. 498; 35 Cyc. 243; Secor v. Ardsley Ice Co., 117 N. Y. S. 414; Mayor, etc., of Baltimore v. Lefferman (Md.), 45 Am. Dec. 145; Radish v. Hutchins, 95 U. S. 210; Gutzkow Bros. v. Brease, 72 N. W. 45; Harris v. Carey, 112 Va. 362, Ann. Cas. 1913a, 1353; Klien et ux. v. Bayer (Mich.), 991; Harry Tie and Lumber Co. v. Rennolds (Va.), 40 S. E. 919.

As to involuntary payment and fact that compulsion must continue down to payment.

Cobb v. Charten, 87 Am. Dec. 178 (Conn.); Heckman v. Swartz, 50 Wis. 267; Chamberlain v. Reed, 13 Me. 357, 29 Am. Dec. 506.

Protest was not a necessary precedent to the right of action.

3 Page on Contracts, sec. 1509.

Redelivery of the property and its acceptance by the bailor is not a defense to an action for an injury to such property.

5 Cyc. 215; Cartledge v. Sloan, 124 Ala. 596, 26 Southern, 918; Tuttle v. Moodey (Texas), 94 S. W. 134.

As to waiver of breach, see the following cases, and 40 Cyc. 259:

Forbes v. Drumm, 15 La. Ann. 11; Alstin v. Miller, 74 N. C. 274; Dunn v. Daley, 78 Calif. 640; Marsalis v. Thomas, 13 Tex. Civil App. 54; Pierson v. Tindall (Tex. Civ. App.), 28 S. W. 232; Garfield, etc., Co. v. R. R., 166 Mass. 119; Bycklin v. Davisson, 155 Pa. State, 362.

What plaintiffs sold the steers for has nothing to do with the amount of damages they would be entitled to recover.

Sedgwick on Damages, vol. 2, sec. 762; Southerland on Damages, vol. 3, sec. 670; Elliott on Contracts, vol. 5,

sec. 5113, note 34; Brown v. Biglow, 10 Allen, 242; Berry v. Shannon (Ga.), 25 S. E. 514; J. I. Case Plow Works v. Nyles, Scott & Co. (Wis.), 63 N. W. 1013; Andrews v. Schniber, 93 Fed. 367; Merrimac Mfg. Co. v. Zuntard, 107 Mass. 127; Altman, Taylor & Co. v. Hetherington, 42 Wis. 622.

### BRIEF OF APPELLANT IN REPLY.

The appellate court will adhere to the construction of the pleadings made by the trial court.

Comegys v. Emerick, 134 Ind. 148, 39 Am. St. R. 245; Callowar v. Mellett, 15 Ind. App. 366, 44 N. E. 198; Anderson Foundry v. Myer, 15 Ind. App. 385, 44 N. E. 193; So. Pac. Co. v. Kennedy, 9 Tex. Civ. App. 232, 29 S. W. 394.

Appellees cannot shift the ground on which their complaint and judgment stand.

San Marcial Land & Imp. Co. v. Stapleton, 4 N. M. 8; Vail v. Long Island R. R. Co., 106 N. Y. 283; Beacher v. Schuback, 23 N. Y. Supp. 604; Wilson v. Palo Alto Co., 65 Iowa, 18; Cotten v. Thompson, 25 Ala. 671; Langley v. Harmon, 97 Mich. 347.

Necessity of pleading warranty in lower court.

Miller v. Van Tassel, 24 Cal. 458; Holman v. Dord, 12 Barb. 336; Deyo v. Hammond, 102 Mich. 122; Torkelson v. Jorgenson, 23 Minn. 383; Watson v. Roode, 30 Neb. 264; Taymon v. Mitchell, 1 Md. Ch. 496; 35 Cyc. 410 447 448 454.

### STATEMENT OF FACTS.

On the 16th day of September, 1912, one Roy Williams and A. V. McQuiddy entered into a contract with J. M. and R. W. Higginbotham, through J. L. Higginbotham, as agent and representative of J. M. and R. W. Higginbotham, whereby the Higginbothams agreed to deliver to said Williams and McQuiddy, f. o. b. the cars at Bovina,

Tex., about 3,500 head of coming four and five year old steers, all to tooth at three years old, or older, being all the steers of that age then on the ranch of the Higginbothams, in Chaves county, N. M., and Cochran county, Tex., subject to a 15 per cent. cut after excluding all big-jawed, blind, sway-backed, crippled, or otherwise unmarketable steers, with delivery on or before December 1, 1912. The contract also provided that, on request of the said Williams and McQuiddy, and the payment by them of an additional $5 per head, the Higginbothams would winter said steers, and make delivery on May 1, 1913, the steers then to be of the ages of four and five years. Subsequent to the making of this contract, and on September 28, 1912, a supplementary contract was made whereby it was agreed that, should delivery be made by May 1, 1913, on any part of the cattle, their ages were to be three and four years on December 1, 1912. Subsequent to the making of this contract Williams and McQuiddy assigned it to John C. Cadwell, one of the plaintiffs in the lower court, in consideration of the repayment to them of the original cash payment to the Higginbothams and a bonus of $9,000. Notice of assignment was given to the Higginbothams, and about the middle of November the said Cadwell, at the ranch of the Higginbothams, elected to have the Higginbothams hold the cattle over the winter, for delivery May 1, 1913. This was agreed to by the Higginbothams. It also appears from the evidence that one R. C. Sowder, some time during the winter, became interested in the cattle and the contract sued upon together with Cadwell. During the winter Cadwell and Sowder saw the cattle several times, together with prospective purchasers, including the witnesses for the plaintiffs, Fergusson and Nations.

The plaintiffs, Cadwell and Sowder, testified that the cattle were in satisfactory condition at all times when they saw the cattle, until about the last of February, 1913; that in February, 1913, there was some talk with J. L. Higginbotham with reference to the water supply in the two pastures where the cattle were being held. It also

appears from the testimony offered by the plaintiffs that, about the middle of January, 1913, the plaintiffs made a contract to sell the cattle included in the contract of September 18th, for $7.10 per hundredweight. About the 23d day of March, 1913, the plaintiff Sowder was present at the Higginbotham ranch, where the cattle were dipped, preparatory to shipment, and remained there until cattle were finally delivered. Dipping was completed, and on the 9th or 10th day of April plaintiff Cadwell and the witnesses Fergusson and Nations arrived at the Higginbotham ranch to receive the cattle. The cattle were at that time rounded up in what is known as the "Six Shooter pasture," there being some 4,500 head in the herd. Before cutting the cattle, some discussion was had as to how the cutting and shaping up of the herds should be handled. It was finally decided that the large herd should be cut into two herds of approximately equal numbers. It was further agreed that the witness Fergusson, on behalf of plaintiffs, should cut out of the herd all steers under age, and all big-jawed and otherwise unmarketable steers, and generally put the herds in shape for the final cut of 15 per cent. The cutting of the two herds occupied two days. On the first day the witness Fergusson shaped up the first herd, and they then proceeded to cut out under the 15 per cent. allowed in the contract. The cutting out proceeded until all but about 30 or 40 head had been cut out. There was then some discussion as to whether they should continue to cut on the first herd, or should reserve the extra 30 or 40 for the second herd. It was finally decided to proceed with the work of shaping up the second herd. In the meantime some work had been done on the second herd. This work continued on the second herd until a dispute arose between the foreman for the Higginbothams and the plaintiffs; the foreman for the Higginbothams claiming they had taken the 15 per cent. cut out of the second herd, except some few head, and the plaintiffs claiming that they had not yet finished shaping up the herd, making ready for the 15 per cent. cut, and that there were still some under age and unmerchantable cattle in the herd to be cut out before the 15 per cent. cut

should be taken. This dispute was referred to J. M. Higginbotham. After some discussion, he notified the plaintiffs, in effect, that they had taken their 15 per cent. cut, excepting a few head, and that they could proceed to cut the remaining few and take the cattle just as they were within five minutes, or he would turn the herd loose. There was some further discussion with reference to whether the plaintiffs had, as a matter of fact, taken the 15 per cent. cut, with the result that the plaintiff Cadwell then notified J. M. Higginbotham that they would take the cattle under protest. The cattle were then started for Bovina, where both herds were loaded into the cars. While the cattle were being loaded, it was noticed that there were a few big-jawed cattle in the bunch. The plaintiffs testified that they pointed out these cattle to J. M. Higginbotham, and demanded that they be taken out of the herd, and not included in the sale, but that Higginbotham refused to take them out, and that they again informed Higginbotham that they were taking the cattle under protest, without making the protest more specific than the mere use of the words "under protest." J. M. Higginbotham testified that his attention was called to certain big-jawed cattle in the bunch, and that he refused to take them back, for the reason that these big-jawed cattle should have been cut out at the ranch, and not at Bovina, some 50 miles from the ranch.

By the contract of sale made by the plaintiffs, Cadwell and Sowder, the cattle were to be sold by weight at Bovina, Tex., but because of the fact that there were no scales at Bovina the cattle were actually weighed, and sold by weight, at Wellington, Kan. Payment for the cattle was made to the Higginbothams by checks delivered on the train, between Bovina and Amarillo, Tex. There is no testimony that there was any protest of any nature whatsoever made at the time the checks were delivered. The only testimony with reference to the protest claimed to have been made by the plaintiffs relates to the occasion of the dispute occuring at the ranch, on the second day, when they were shaping up and cutting the second herd,

·and at Bovina, when the big-jawed cattle were discovered in the herd. It appears from the testimony that there were very few, if any, three year old steers in the first herd, which was the first shipment out of Bovina, and the first herd to arrive at Wellington, Kan. On the arrival of the first shipment at Wellington, Kan., the cattle were fed and watered in the stockyards, and at the end of 24 hours, and before the arrival of the second shipment some 200 head, picked at random from the herd, were weighed and upon these weights payment was made to the plaintiffs, Cadwell and Sowder, by the purchasers of the cattle, including the cattle in the second shipment. This was the result of a subsequent agreement, on account of the condition in which the parties found themselves, due· to the conduct of the defendants in this case, whereby the plaintiffs agreed to pay the feed bill of about $1,000 in consideration of this average being used.

In the fall of 1913 the plaintiff, Cadwell, brought suit individually against the three Higginbothams and the Higginbotham Cattle Company for damages, alleging breach of contract. The complaint contained four counts. The first eleven sections of each count were identical in form. In the first count the plaintiff alleged breach of the contract, in that the defendants had failed to handle and care for the steers during the winter of 1912 and 1913 in a careful manner, but had unnecessarily rounded up, driven, and cut said steers many times, to the plaintiff's damage in the sum of $2 per head. The second count alleged a breach of the contract, in that the defendants had failed to handle the cattle, during the winter of 1912 and 1913, in a stockmanlike manner, and had starved them for water and grass, thereby causing them to lose weight, to the plaintiff's damage in the sum of $7.10 per head. The third cause of action alleged a breach of the contract, in that the defendants compelled the plaintiff to make his cut from 4,500 head of steers, of which number about 1,000 head were under age, to the plaintiff's damage, and by compelling the plaintiff to take under said contract 701 head of under age steers, to the

plaintiff's damage in the sum of $7.430.00.   The fourth cause of action alleged a breach of the contract, in that the defendants compelled the plaintiff to take 9 head of big-jawed cattle, to the plaintiff's damage in the sum of $225.   In each of the counts, the plaintiff seeks to avoid the effect of inspection, acceptance, and payment by alleging that the cattle were accepted under protest, and under such conditions and circumstances, because of the situation in which the plaintiff was placed, due to his contract of sale, at $7.10 per hundredweight, and the money which he had paid to Williams and McQuiddy for the contract, as amounted to legal duress.

A first amended complaint was filed, not materially· changing the allegations of the original complaint.   Answer was filed by J. L. Higginbotham and the Higginbotham Cattle Company, denying that any of the cattle delivered were not three years old in December, 1912, and denying that the plaintiff protested against any requirement made by the defendants under said contract, and denying that the defendants failed and refused to comply with the contract, and generally denying any breach of the contract by the defendants.   Similar denials were made to each of the counts of the complaint, with an affirmative defense denying the authority of J. L. Higginbotham to bind the other defendants in the making of the contract of September 16, 1912, and presenting the further defense that by inspection, acceptance, and payment the plaintiff waived an alleged or pretended breach of the contract, and further alleging due performance by the defendants of all the terms and provisions of the contracts, and in particular with reference to permitting the plaintiff to cut the herd, and, further, that the defendants duly performed the contract with reference to handling the cattle during the winter of 1912 and 1913.

A reply was filed in due course, denying each and every allegation of the answer by way of new matter.   Trial was had in March, 1914, and at the conclusion of the plaintiff's case, by leave of court, a second amended complaint was filed, adding Sowder as a party plaintiff, and

otherwise changing certain of the allegations of the first amended complaint. Issue was duly joined upon the second amended complaint, without materially changing the issues raised by the original answer, except under the third count. At the conclusion of the trial, requests for findings of fact and conclusions of law having been presented by counsel for the defendants, the court made findings of fact and conclusions of law upon the various counts of the complaint, wherein he found, among other things, that the defendants had breached the contract under each of the four counts of the complaint, and further found that the inspection, acceptance, and payment made by the plaintiffs were under such circumstances as amounted to legal duress, and that, the acceptance being under legal duress, such acceptance did not waive the right of the plaintiffs to claim damages; and the court thereupon proceeded to assess damages in various amounts under the four counts, with the result that there was entered a judgment against the defendants in the sum of $29,111, with interest at 6 per cent. per annum from the date of the judgment, and costs to be taxed. From this judgment this appeal is prosecuted.

## OPINION OF THE COURT.

ROBERTS, C. J. (after stating the facts as above.)— In the third cause of action, stated in the second amended complaint, upon which the cause proceeded to trial, it was alleged that appellees were compelled to make a 15 per cent. cut from 4,500 head of steers—about 1,000 of which were three years old—and in making this cut they were compelled to take 701 head of three-year-old steers. After appellees had introduced their evidence, which showed that the herd contained a less number of three-year-old steers than alleged, but that appellees, because of the inclusion of such three-year-old steers in the herd, had been compelled to take 300 head of such under age cattle, and by reason thereof had been deprived of the 15 per cent. cut from the proper aged cattle, from which it resulted that they had been forced to accept about 400 head properly subject to rejection, under the 15 per cent. provision,

appellees applied for and were granted permission to amend their complaint in accordance with the above facts.

[1] Appellants contend that this amendment could not be made, and cite in support thereof the case of Loretto Literary Society v. Garcia, 18 N. M. 318,, 136 Pac. 858. In that case the suit was instituted in ejectment, and plaintiff, upon the trial, sought by amendment of the complaint to change the action to one of equity, for the specific performance of a contract to convey real estate. This we held could not be done, because under the statute the court could not permit an amendment which changed "substantially the claim or defense." In the present case, appellees were seeking to recover the damage which they suffered by being compelled to accept certain cattle, which they were entitled to refuse. They were complaining of the fact that they had not been given the right to make the proper "cut" under the contract. It is true they alleged in their first complaint that the cattle were under age; but the fact that they were entitled to reject the cattle under the contract, on some other ground, did not substantially change plaintiff's claim.

More serious objections, however, are urged against the action of the trial court in awarding appellees a recovery under the first and second counts of the complaint. By the first count a recovery was sought for alleged negligent handling of the cattle by appellants, after they had been notified by appellees that they would exercise their option under the contract and require them to hold the cattle over for May delivery. The second count proceeded upon the theory that appellants had failed, after the exercise of said option by appellees, to furnish the cattle with sufficient water and grass, whereby said cattle deteriorated in value, by reason of the loss of weight. Under the first count appellees were awarded the sum of $3,701, and under the second count $18,005. Appellants contend that the trial court erred in the above awards, because the appellees accepted the cattle, without objection, in so far as the matters and things complained of in these counts of the complaint are concerned and voluntarily paid

for them; hence they argue that they are precluded from recovering any portion of the money, as it was voluntarily paid. Appellees, on the other hand, contend that the instant case is not a suit for the recovery of money, either voluntarily or involuntarily paid, but that it is a suit to recover damages caused by the breach of contract and the wanton acts and negligence of the appellants. The complaint, in the two counts, after reciting the facts, it is true, prays for damages in a specified sum; but it is obvious that, if the money voluntarily paid under an executory contract of sale cannot be recovered, that no recovery can be had by way of damages, where the property has been accepted by the vendee after opportunity to ascertain the defect.

[2] The rule relative to the recovery of damages in such cases is stated by the New York Court of Appeals as follows:

"In cases of executory contracts for the sale and delivery of personal property, the remedy of the vendee to recover damages on the ground that the article furnished fails to correspond with the contract does not survive the acceptance of the property by the vendee after opportunity to ascertain the defect. Reed v. Randall, 29 N. Y. 358, 86 Am. Dec. 305; McCormick v. Sarson, 45 N. Y. 265, 6 Am. Rep. 80; Beck v. Sheldon, 48 N. Y. 373; Dutchess County v. Harding, 49 N. Y. 321; Gaylord Mfg. Co. v. Allen, 53 N. Y. 515; Coplay Iron Co. v. Pope, 108 N. Y. 232, 15 N. E. 335; Mason v. Smith, 130 N. Y. 474, 29 N. E. 749." Waeber v. Talbot, 167 N. Y. 48, 60 N. E. 288, 82 Am. St. Rep. 712.

In the case of Reed v. Randall, supra, the court said:

"The principle that, when the contract of sale is executory, the remedy of the purchaser to recover damages, on the ground that the article furnished does not correspond with the contract, will not survive an acceptance and retention of

the property, after opportunity to ascertain the defect, without notifying the vendor, is well supported by authority."

In this case the court reviews and cites many English and American cases in support of the rule. The case note, in 86 Am. Dec. 305, where this case is reported, shows that this view of the law has been generally accepted by the American courts. See, also, Elliot on Contracts, § 2110.

[3] The contract in the instant case was an executory contract for the sale of cattle. The first, second, fourth, and fifth paragraphs of the contract, which alone are material here, read as follows:

"(1) That parties of the first part, for and in consideration of the payments to be made as hereinafter specified, have contracted and agreed, and hereby contract and agree, to sell and deliver to the parties of the second part, f. o. b. cars at Bovina, Texas, with clean bill of health, about thirty-five hundred (3,500) head of coming four and five year old steers, all to tooth at three years old or older; said cattle constituting all steers of this age now ranging on the ranch of parties of the first part in Chaves county, N. M., and Cochran county, Texas, and being branded 'X—or Lazy X—' on the left side, all of which said cattle are to be good merchantable steers and dehorned, and to be subject to a fifteen per cent. cut, which said cut is to apply after exclusion of all big-jawed, blind, sway-backed, crippled, and otherwise unmerchantable steers.

"(2) That said parties of the second part have contracted and agreed, and by these presents do contract and agree, to pay the said parties of the first part the sum of $50 per head for said steers upon delivery of same as under the terms of this contract, and that as an evidence of good faith said parties of the second part have this day paid to said parties of the first part the sum of $15,-000, or $5 per head on said steers, which said

$5 per head is to be deducted from the price and allowed on delivery of each steer.

"(4) That said parties of the first part agree to carry any or all of said cattle until May 1, 1913, at the request of said parties of the second part, but in the event same are carried until said May 1, 1913, said parties of the second part shall pay an additional $5 per head for said extension of delivery.

"(5) That said parties of the first part hereby acknowledge the receipt of the $15,000 earnest money, which is to constitute a part of the purchase money if said deal is consummated by said parties of the second part; but, in the event said parties of the second part fail or refuse to carry out the terms of this contract, said $15,000 earnest money shall be forfeited outright to said parties of the first part. In case the parties of the second part should at any time receive a partial delivery of these cattle and take out only top steers, then the forfeit money of $5 per head is to remain until the last delivery and the full price of $50 per head is paid for the full bunch; but it is understood that cutting cattle for flesh is not to be considered a top."

Under the above contract appellees had the right to demand "good merchantable steers," and if the cattle offered them did not comply with the terms of the contract they had the right to refuse to accept them and demand a return of their earnest money, and to recover such damages as they were able to prove, for the breach of the contract. Such being the case, we are relegated to the inquiry as to whether appellees accepted the cattle under duress, assuming that the pressing business necessities, hereinafter more fully discussed, amounted to legal du ress, and rendered the acceptance and payment involuntary; and the solution of this question depends upon the facts as established by the record.

Cadwell v. Higginbotham, 20 N. M. 482.

While there is some evidence in the record tending to show that the cattle were negligently handled prior to their delivery to appellees, and that they suffered from lack of water, which cause them to deteriorate in weight, and also that appellees at various times called the attention of appellants to the necessity of providing a more ample supply of water, however, when appellees went to receive the cattle in April, 1914, they proceeded to shape up the herds for final acceptance, without saying anything whatever about the condition of the cattle, or entering any objection to receiving them as fully complying with the terms of the contract. In order to facilitate the shaping up of the herd, it was divided into about two equal portions. The parties proceeded to and did cut out practically all the three-year-old steers, and the 15 per cent. cut allowed under the terms of the contract, from the first half of the herd. When no more than 45 or 50 cattle remained in the first herd, which the parties were entitled to eliminate, they ceased work on this herd, desiring to shape up the second herd first, in order to ascertain whether it would not be to their advantage to cut out the excess from the second herd. The parties proceeded to shape up the second herd, until a dispute arose as to whether the appellees had exhausted their right to cut out undesirables; appellants contending that they had cut out all the cattle they were entitled to under the terms of the contract, or practically all, while appellees insisted that they had not begun on the 15 per cent. cut, which applied only to four and five-year-old steers, but that all the cattle they had eliminated were three-year-old steers, which they were entitled to cut out, before exercising their right under the 15 per cent. provision. As to what occurred, Mr. Sowder, one of the appellees, testified as follows:

"We worked on a while, and then Mr. Higginbotham came over to the cattle and said we had our 15 per cent. cut and would have to stop, and we got to arguing the case, that the three-year-old cattle were not all out, and that we had not

cut the 15 per cent. cut. He said, 'You will take the cattle just as they stand; you will take the cattle just as they are in five minutes, or I will turn them loose;' and we reasoned with him to quite an extent that it wasn't right and proper, that it was not the terms of the contract, and according to the contract, but he said, 'You will take them right now, or you will not take them at all.' * * * We told them we would suffer, but would receive the cattle under protest. He said, 'I don't care how you receive them, only that you will receive them.' He was laying us liable. We knew that they had $15,000, and they had $9,000 more money under the contract, in addition to the damage. Then we had $24,-000 involved in the matter, and that the damage we are liable for if we didn't receive the cattle and comply with the contract with Fergusson, Nations, and Porter that we were liable for, and he was forcing us to receive the cattle under the circumstances, but receiving them under protest, and wanted him to distinctly understand it.

"Court: Q. What did Mr. Cadwell say to Higginbotham about the cattle at that time? A. He says, 'You are forcing us to take these cattle, so as to make us deliver to save ourselves under the contract with these parties, and we are taking them under protest, and I want you to distinctly understand that.' "

Appellee Cadwell testified as follows:

"Q. What was said then in your presence, if anything, to Mr. Higginbotham about being stopped and about taking the herd of cattle? A. Mr. Rogers said we had I don't remember how many head, 5 or 25 head, yet to cut out of the herd, and Mr. Fergusson insisted that we not exercised the rights on the herd. Mr. Higginbotham says, ' * * * You take the cattle as they are in the next five minutes or I'll turn them

loose;' that's what he said. Q. What did you say, if anything? A. I told him, 'If we receive these cattle, it will be under protest,' and he says, 'I don't care how you receive them, just so you take them.' "

A witness named Fergusson testified on behalf of. appellees as follows:

"Everything went along in pretty good shape until Mr. Rogers came down, when the boys were about ready to cut, and says, 'There is only 37, or 47, more cattle to come out according to the contract;' and I said, 'Mr. Rogers, you know that that isn't right;' and he says, 'I am working for Higginbotham.' I said, 'That don't make any difference; you ought to do what's right, and you know that isn't right;' and so he just got mad, and so did Mr. Sowder. Mr. Higginbotham wouldn't explain, and started to town; went off in the car. I don't know what he said. Q. What was it? Give it as near as you can. A. Said they had to take the cattle just as Mr. Rogers said, or they couldn't have them at all. Says, 'These cattle are making the boys $25,000,' and they just had to take them as they were, or couldn't take them at all, and started off; and I went on, and got him to come back, and said, 'You know this is wrong; we have got to get together; these boys sold us the cattle, and we have paid part for them, and we have got to see this thing through.' So he finally came back. He said— Higginbotham said, 'I will give the boys the money back and keep the cattle.' I went to Cadwell, and he said he would do so. I went down to Mr. Higginbotham again, and he says, 'No; I won't give the money back.' He changed his mind in a couple of minutes, so that we were up against it. The boys said, 'We will receive them under protest.' Q. What did these gentlemen say about not wanting to take the cattle—

about the protest that they made? A. Well, Mr.
Rogers came up, as he did quite often while we
were trying to settle matters, and Mr. Sowder
told him, and so did Mr. Cadwell—told Mr.
Higginbotham that he protested on taking them
that way, and he said, 'You will take them that
way, if you take them at all.' In the meantime,
however, I had been talking quite a bit with Mr.
Higginbotham, and he gave me to understand
early in the game that he would not move one of
the steers for anybody in the bunch unless I
would agree to pay for them."

Again, the witness Sowder testified, in answer to the
question as to whether they had cut the 15 per cent. cut,
as follows:

"A. No, sir; had not finished. We never was
allowed. He stopped us at the time. We rea-
soned and plead the case with him, and said we
had not gotten the cattle. He claimed that we
had. Mr. Fergusson talked to him, and so did
Mr. Cadwell talked to him."

Later the witness further testified:

"Mr. Cadwell told him, 'I just want you to
understand that we are receiving these cattle
under protest, and we are going after you.'"

All the above evidence shows clearly that the only
ground upon which the appellees were objecting to receiv-
ing the cattle was the fact that they were compelled to
take a number of three-year-old steers, and were being de-
prived of their right to exercise their 15 per cent. cut
from four and five-year-old steers. During the examina-
tion of the appellee Sowder as a witness, the following
question was asked by counsel and answered by him as fol-
lows:

"Q. Was the condition of the cattle included
by you in your protest to him about having to
take the cattle? A. At all times it was; yes,
sir."

In their brief, appellees' counsel, discussing the above
question and answer, say:

"This witness evidently referred to the testimony in which he stated that during the entire time from February to the time of delivery he made constant and frequent complaints about overstocking this pasture, and about the scarcity of water, and about bringing 1,000 head of extra cattle there to dip when the water conditions were as short as they were."

Assuming this construction of the language of the witness justifiable, still we fail to see wherein it supports the judgment of the trial court. There is nothing in the record to show that appellees ever protested against receiving the cattle at any time, other than when they were being finally shaped up for delivery, at which time, as stated, the protest was upon the ground that appellees were being compelled to accept the cattle which they were entitled to eliminate under the provisions of the contract. All the various conversations between the parties, relative to the cattle, were testified to in detail, and in all these conversations not a word of objection to receiving the cattle on account of their having been "choused around," or given insufficient water, was uttered. The above statement of the witness Sowder was a mere conclusion, not justified under the facts. This being true, there is no evidence in the record tending to show that the acceptance of and payment for the cattle by appellees was involuntary, in so far as the first and second counts of the complaint are concerned. So far as the record shows, it might be that, had appellees objected to receiving the cattle on the grounds set forth in these two counts of the complaint, appellants might have rescinded the contract and have restored to appellees the earnest money paid, or they might have made the proper deduction in the purchase price.

Appellants argue that protest is essential in all cases, in order to show that the payment was involuntary; while appellees, on the other hand, insist that protest is not necessary, where in fact the money is paid under compulsion. Assuming, without deciding, that appellees are correct in their contention, it must be true that the party to whom the money is paid must be made aware in some

manner that the payment is being involuntarily made; otherwise, in all cases where money is paid to another, for the purpose of securing possession of property, or completing a contract of purchase, in order to comply with some pressing business engagement, the payor could inspect and accept and pay for such property, or the charge against the same, and thereafter bring suit for damages, or for a return of the money paid, and the party to whom the money has been paid have no prior notice or knowledge of any dissatisfaction on the part of the purchaser, or any knowledge of any intention on the part of such payor to claim remuneration, or a return of the money. In the present case the record contains no facts which tend to show, in so far as the first two causes of action are concerned, that the payment made was not voluntary; hence appellees were not entitled to recover thereunder.

In this court, appellees argue that as a matter of law duress was not absolutely necessary to sustain any of the causes of action, for the reason that the contract, in so far as the first and second counts of the complaint are concerned, contained three elements: First, the contract of sale; second, a contract of agistment and bailment; and, third, an implied contract to handle the steers in a stockmanlike manner. The issues in this case, as framed by the pleadings and as interpreted by the trial court, were upon the theory of duress of goods. The defense offered was: That acceptance, after knowledge of the failure of defendants to keep their agreement, was a waiver of the right to recover damages. The complaint, as to all of the counts, was framed upon this theory, and is, in effect, a plea of confession and avoidance; i. e., the plaintiffs, after pleading the contract, admitted that they had received and paid for the cattle, but claimed that such acceptance and payment did not estop them from recovering damages, for the reason that they were compelled to take the cattle and pay for them under circumstances amounting to legal duress of goods. This was the issue presented by the pleadings, and the theory upon which the case was tried in the lower court. Nothing appears in the record showing that it was appellees' contention that the con-

tract was one of agistment or bailment, so far as the first and second causes of action are concerned, and the first intimation of this claim is contained in appellees' brief. The same is true of appellees' contention that the contract contained an express warranty which survived acceptance and delivery. This brings us to a consideration of two propositions of law:

[**4**] (a) The appellate court will adhere to the construction of the pleadings made by the trial court:

"When the trial court has placed a reasonable construction upon the averments of the complaint, which might bear two constructions, this court will be disposed to adhere to the construction which it received by the trial court." Comegys v. Emerick, 134 Ind. 148, 33 N. E. 899, 39 Am. St. Rep. 245.

"Where the facts pleaded are such that they may be construed as proceeding on different theories in the statement of a cause of action, the construction placed thereon by the trial court will be followed by the appellate court." Calloway v. Mellett, 15 Ind. 366, 44 N. E. 198, 57 Am. St. Rep. 238.

"Where a pleading may be construed as proceeding on two or more theories, the theory adopted by the parties and the trial court will be followed by the appellate court." Anderson Foundry v. Myers, 15 Ind. App. 385, 44 N. E. 193.

"Where a trial court, without objection, placed a certain construction on the wording of a pleading, the pleading admitting of it, such construction will prevail on appeal." Southern Pac. Co. v. Kennedy, 9 Tex. Civ. App. 232, 29 S. W. 394.

[**5**] (b) Appellees cannot, in this court, shift the ground on which their complaint proceeds, and the judgment stands, and now advance new theories to sustain the judgment of the lower court. This question was passed upon by the territorial court in the case of San Marcial

Land & Improvement Co. v. Stapleton, 4 N. M. (Johns.) 8, at page 13, 12 Pac. 621, at page 622, where the court said:

"Had the pleader, in drawing the bill, relied in any respect upon the insufficiency of the power to warrant the mortgagee in carrying it into effect by a sale as threatened, and had defectively or insufficiently set out the particular reasons or grounds, and the defendant had answered or filed pleas, it would have been too late to make the objection here; but in the record before us the power was not assailed, and constituted no part of the equitable grounds alleged for relief. 'The Supreme Court, in appeals or writs of error, shall examine the record, and on the facts therein contained alone shall award a new trial, reverse or affirm the judgment of the district court, or give such other judgment as to them shall seem agreeable to law.' Section 2190, Comp. Laws N. M. 'No exception shall be taken, in an appeal, to any proceeding in the district court, except such as shall have been expressly decided in that court.' Section 2188, Comp. Laws. There is nothing in Section 2190, above quoted, authorizing the court to hear a case brought by appeal or writ of error upon grounds other than such as appear to have been made in the court below and considered there, or to create by construction or intendment new and distinct issues. While it is true that section 2188 applies to appellants, and denies to them the right to assign errors and insist upon them, unless expressly decided in the district court, it will apply with equal force, by inference and analogy, to appellees, who seek to shift the ground on which the bill and decree stand, in order to lay hold of a surer footing in equity, when that ground was not covered in the cause as it stood in the lower court."

Cadwell v. Higginbotham, 20 N. M. 482.

Sections 2188 and 2190 of the Compiled Laws of 1884, referred to in the decision quoted supra, are carried forward without change as sections 37 and 38, chapter 57, Laws of 1907. On the above proposition of law, see, also, Vail v. Long Island R. R. Co., 106 N. Y. 283, 12 N. E. 607, 60 Am. Rep. 449; Beacher v. Schuback, 23 N. Y. Supp. 604; Wilson v. Palo Alto Co., 65 Iowa, 18, 21 N. W. 175; Cotten v. Thompson, 25 Ala. 671; Langley v. Harmon, 97 Mich. 347, 56 N. W. 761.

[6] While the evidence did not justify a finding that the payment for the cattle, in so far as the first and second causes of action are concerned, was involuntary, it does amply support the allegations of the third and fourth counts of the complaint. The facts, as recited by the witnesses, have been heretofore stated, and need not be repeated here. Appellants argue, however, that these facts do not constitute legal duress. The Supreme Court of the United States in the case of Robertson v. Frank Brothers Co., 132 U. S..17, 10 Sup. Ct. 5, 33 L. Ed. 236, said:

"When such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary. But the circumstances of the case are always to be taken into consideration."

·Tested by this rule, the facts in the present case clearly establish legal duress.

[7, 8] The appellees had paid $24,000 to McQuiddy & Williams for the contract, and appellants had received the sum of $15,000 earnest money under the contract from Williams & McQuiddy. Appellees were willing and offered to accept the four and five-year-old steers, which they were entitled to receive under the terms of the contract. Appellants would not deliver to them the four and five-year-old steers, to which they were entitled under the terms of the contract, unless appellees would accept and pay for 300 three-year-olds and about 400 other unmerchantable and cut back steers. At the time appellants knew that appellees were under contract to deliver these

cattle to Fergusson and others on or about May 1, 1914; that the price of cattle had materially advanced since appellees' contract to deliver the cattle to Fergusson and his associates, who were present and demanding a compliance with their contract. Very clearly, the election of the appellees to refuse to accept the cattle and rely upon an action for damages would have required them either to have paid Fergusson and others the damages due them, together with the return of their money, amounting to $50,000 in all, or to have had two lawsuits to establish their rights—one against Fergusson and others upon their contract of sale, to establish the damages, and the other against the defendants in this case, to recover the same. Under these circumstances, we think a prudent business man would be justified in acting as did these appellees. The case of Lonergan v. Buford, 148 U. S. 581, 13 Sup. Ct. 684, 37 L. Ed. 569, was very much like the case at bar; the only real distinction being that a larger proportionate sum had been paid on the cattle, and the threatened loss of a portion of the cattle by lack of care and attention during the approaching winter. The court said:

"Finally, it is objected that the last payment was voluntary, and therefore cannot be recovered, either in whole or in part, although it was in terms made under protest. It appears from the testimony that the defendants refused to deliver any of the property without full payment. This was at the commencement of the winter. The plaintiffs had already paid $175,500, and without payment of the balance they could not get possession of the property, and it might be exposed to great loss unless properly cared for during the winter season. Under those circumstances, we think the payment was one under duress. It was apparently the only way in which possession could be obtained, except at the end of a lawsuit, and in the meantime the property was in danger of loss or destruction. The case comes within the range of the case of Radich v. Hutchins, 95 U. S. 210, 213 [24 L. Ed. 409], in which

the rule is thus stated: 'To constitute the coercion or duress which will be regarded as sufficient to make the payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief, than by making the payment.' As stated by the Court of Appeals of Maryland, the doctrine established by the authorities is that 'a payment is not to be regarded as compulsory unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid.' Mayor & City Council of Baltimore v. Lefferman, 4 Gill (Md.) 425 [45 Am. Dec. 145]; Brumagin v. Tillinghast, 18 Cal. 265 [79 Am. Dec. 176]; Mays v. Cincinnati, 1 Ohio St. 268."

In the case of Guetzkow Brothers Co. v. Breese, 96 Wis. 591, 72 N. W. 45, 65 Am. St. Rep. 83, the plaintiff could not obtain certain insurance money due it unless the defendant joined in executing proofs of loss and in indorsing the drafts. The defendants refused to do these things unless the plaintiff would pay them $666.74, which it did not owe. The plaintiff was in a position where it must obtain its insurance money at once, in order to go on with its business and fulfill valuable outstanding contracts, or it would suffer great loss. Under these circumstances it submitted under protest to the unjust demand in order to obtain its money from the insurance company. The court, after reciting the above facts, said: "This, makes a case of legal duress of goods." See, also, note to the above case in 65 Am. St. Rep. at page 85.

A case as nearly like the instant case as one could expect is White v. Oliver, 32 Okl. 479, 122 Pac. 156. This was an action by the plaintiff for freight which he had paid upon certain cattle which he sold the defendant, on account of a portion of the cattle being contrary to the

terms of the contracts. The defendant testified that the
cattle were received under an executory contract of sale,
and that he was to receive a certain grade of cattle, and
that a portion of the cattle were in compliance with the
contract and a portion were not, but that the plaintiff re-
fused to allow him to have any of the cattle unless he re-
ceived and paid for all of them, and that he had already
paid a substantial part of the contract price. The court
said:

> "We think, under the evidence produced, that
> the court erred in submitting to the jury the the-
> ory that the defendant waived his right to the
> kind of cattle contracted for by accepting the
> others, as the uncontradicted evidence estab-
> lishes that the defendant, while receiving other
> cattle, did so under protest. * * * And it was
> error for the court to present this theory of the
> case to the jury. There is no evidence in the case
> that the defendant agreed to accept these cattle
> in the sense in which the word 'accept' is used in
> this instruction. It is, of course, true that the
> defendant received the cattle; but he did so un-
> der protest, as the counsel for the plaintiff has
> admitted in his brief, and receiving them under
> protest was not an acceptance of them, or an
> agreement to receive them, under the contract. If
> it be true that they were received under protest,
> and under the circumstances of this case, this
> would not be a waiver of the defendant's right
> to claim damages."

In the case of Vyne v. Glenn, 41 Mich. 112, 1 N. W.
997, in the Supreme Court of Michigan, the court said:

> "The defendant informed the plaintiff that he
> had stopped the payment of certain moneys due
> the latter from third parties, well knowing plain-
> tiff's circumstances at the time, and that his fail-
> ure to get the money so due him would result in
> his financial ruin, and thus compelling the plain-
> tiff to settle with the defendant in order that the

> stoppage might be removed. It is idle to say that such settlement was free and voluntary, and that it should be sustained. To say that the plaintiff had a legal remedy if a wrong had been done him, or that the commencement of garnishee proceedings would not vitiate a settlement thereafter made between the debtor and creditor, may be true generally; but where the wrong done, as in this case, was for the evident purpose of forcing a settlement not in accordance with the legal rights of parties, and where delays incident to litigation would but work ruin, which the plaintiff dreaded, to hold that because he had a legal remedy for the wrong, and did not avail himself thereof, would not meet the difficulties in a case like the present."

Appellants contend that as payment was made on the cars, after the cattle had been loaded, that it was made at a time when there was no duress; hence there can be no recovery. The facts are as follows: Appellees had contracted to sell the cattle to Fergusson and his associates, from whom they expected to obtain the money to complete the payment to appellants. Appellants refused to permit appellees to load the cattle until they had secured the verbal promise of Fergusson that he would pay the balance due on the cattle before the shipment arrived at its destination. After the cattle were loaded, and were on their way to their destination, Fergusson paid appellants the balance alleged to be due under the contract. It will therefore be seen that, in so far as payment by the appellees was concerned, that had been made before the cattle were accepted, because they no longer controlled the matter of payment. If goods be released on the promise of a third party to pay the charges against the same, and if such third party, instead of resisting payment, pay according to such promise, this does not prevent a recovery of the money back by the party for whom such payment was made, if he has reimbursed, or undertaken to reimburse, such third party for such payment. Chamberlain v. Reed,

13 Me. 357, 29 Am. Dec. 506; Heckman v. Swartz, 40 Wis. 267, 6 N. W. 891.

The contention of appellants that appellee had an adequate remedy at law has been disposed of by what has been heretofore said. It is stated in 30 Cyc. 1311, that:

> "There is a class of cases, however, where, although there is a legal remedy, his situation or the situation of his property is such that it would not be adequate to protect him from irreparable injury, in which case payment will be deemed to have been involuntary."

While appellants have assigned and discussed errors other than those referred to and discussed above, the remaining assignments are so clearly without merit that no discussion or consideration of the same is required or warranted. It is our conclusion that the trial court erred in awarding any damages under the first and second counts of the complaint, and properly awarded damages in the correct amount under the third and fourth counts thereof.

The cause will therefore be reversed and remanded, with directions to the trial court to enter judgment for the appellees in the sum of $7,402, with interest thereon at the rate of 6 per centum per annum from June 5, 1914, together with the costs properly chargeable against appellants; and it is so ordered.

HANNA and PARKER, J. J., concur.