601 P.2d 437

**FIRST NATIONAL BANK IN CLAYTON, Plaintiff-Appellant,**

**v.**

**Roy M. WOOD, Defendant-Appellee.**

**No. 3752.**

Court of Appeals of New Mexico.

Sept. 6. 1979.

Rehearing Denied Sept. 19, 1979.

Ethan K. Stevens, Clayton, J. Walter Park, IV, David T. Turlington, Davis & Turlington, Inc., San Antonio, Tex., for plaintiff-appellant.

Charles D. Alsup, Clayton, for defendant-appellee.

## OPINION

SUTIN, Judge.

Plaintiff (The Bank) sued defendant (Wood) on a written guaranty given by Wood to The Bank to secure a portion of a debt owed to The Bank by Wood's son. The guaranty was in the sum of $20,000. Wood asserted the affirmative defense of coercion and duress exercised by The Bank in obtaining the guaranty and filed counterclaims. At the close of the case, both parties moved for a directed verdict. The court took the motions under advisement, but announced that it would like to leave the parties where they were when they first entered the courtroom.

After the case was submitted to the jury, it hung and a mistrial was declared. Thereupon, the court granted The Bank's motion for a directed verdict against Wood's counterclaims, and granted Wood's motion for a directed verdict, dismissing The Bank's complaint. The announcement of the court at the close of the case was made effective. The Bank appeals. We affirm.

Two points are raised on appeal but argued as one: (1) the evidence was insufficient to show as a matter of law, economic compulsion which caused Wood to sign the written guarantee, and (2) The Bank was entitled to a directed verdict on the guarantee agreement because the defense of duress or coercion was not established.

Prior to June, 1974, The Bank, along with a correspondent bank in Albuquerque, had extended to Wood a $500,000 line of credit. In June and December of each year, promissory notes at The Bank matured and were renewed if necessary.

In June, 1974, Wood's son was indebted to The Bank in the sum of $68,000. The Bank decided that it needed more security to cover the son's loan and that a guaranty was the only method of obtaining it. The president of The Bank contacted Wood and told him under instructions from the board that " '[W]e can't renew your line of credit until you sign a guaranty on [your son].' " Four other officers of The Bank confirmed the fact that The Bank demanded a guaranty by Wood of his son's indebtedness. Otherwise his notes and credit line would not be renewed. Wood refused to guaranty the entire indebtedness. He went to the First National Bank in Raton as an alternative source at which to seek credit in the sum of $400,000, but this bank was without money to loan him.

From June to September, Wood tried to get his credit renewed. Whenever he spoke with officers of The Bank, they spoke of the indebtedness of the son. Wood said:

They were trying to force me to sign [his son's] guaranty before they would renew my note.

To keep his operations afloat, Wood had to sign a guaranty. He figured that the son's total indebtedness was $68,000; that his son's security was valued at $48,000 and that the deficiency was $20,000. On September 13, 1974, Wood finally agreed to sign the guarantee in the sum of $20,000 so that The Bank would renew his credit that was then 90 days past due. On that date, his son executed a note to The Bank in the sum of $66,337.20 and Wood signed the guarantee. Three days later, on September 16, 1974, Wood's note was renewed and his credit line extended.

The Bank's position was that Wood testified he had had no financial problems with The Bank. Nevertheless, unknown to Wood, the bank examiner notified The Bank that it had exceeded the Wood loan limit and had violated the law, and that The Bank had to negotiate some kind of agreement with Wood. On May 30, 1974, due to a drop in value of his collateral that secured his note, Wood was short $122,000, i. e., if all Wood's cattle were sold, Wood would still owe The Bank $122,000. The Bank told Wood that he had to liquidate a portion of his assets and reduce his indebtedness in order for The Bank to comply with its lending limits. Wood refinanced his land and paid the funds received to The Bank in September, 1974. Having complied, and having signed the guaranty, his note was renewed on September 16, 1974. The Bank's position has no reference to the defense of duress and coercion. But it is obvious that the fault of The Bank created a Bank-Wood problem.

Subsequently, The Bank recovered judgment against Wood's son, and in 1978, Wood's son was discharged in bankruptcy.

The Bank was entitled to a directed verdict against Wood on the guaranty agreement if Wood's defense failed. The only question on this appeal is:

Did The Bank exercise duress or coerce Wood into signing the guaranty agreement as a matter of law?

The Bank relies on *Pecos Const. Co. v. Mortgage Invest. Co. of El Paso*, 80 N.M. 680, 459 P.2d 842 (1969); *Terrel v. Duke City Lumber Company*, 86 N.M. 405, 524

P.2d 1021 (Ct.App.1974), aff'd in part, rev'd in part, 88 N.M. 299, 540 P.2d 229 (1975). The Supreme Court affirmed *Terrel* on the issues raised in this appeal.

In *Pecos* and *Terrel*, plaintiff sued defendant for damages on the basis of business duress and compulsion. In each case, defendant was in the superior bargaining position. "In *Pecos* the establishment of a superior bargaining position (control of funds) created the duty to offer the weaker party a reasonable choice of alternatives." *Terrel, supra*, (86 N.M. at 423, 524 P.2d at 1039). In the case at hand, The Bank was master in the control of funds of Wood by way of non-renewal of Wood's credit line and notes. Its command to Wood was "Guaranty your son's indebtedness or else." No reasonable choice of alternatives were offered. Nevertheless, Wood did seek an alternative choice without success.

*Caldwell v. Higginbotham*, 20 N.M. 482, 151 P. 315 (1915) was cited in *Pecos* and *Terrel*. Paraphrasing the quoted language in 20 N.M. at 507 and 509, 151 P. 315 it reads:

> Duress exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man to obtain a guaranty is wrongfully induced thereby and ought not to be regarded as voluntary.

> To constitute the coercion or duress which will be regarded as sufficient to make the guaranty involuntary, there must be some actual or threatened exercise of power possessed, by the party exacting or receiving the guaranty over the person or property of another, from which the latter has no other means of immediate relief, than by making the guaranty. The doctrine established by the authorities is that a guaranty is not to be regarded as compulsory unless made to emancipate the person or property from an actual or existing duress imposed upon it by the party to whom the guarantee was given.

In effect, these were the instructions given to the jury in *Terrel*. See instructions Nos. 11 and 12 [Id. 418–19].

■ The evidence is undisputed that (1) The Bank threatened Wood with a serious attack upon his financial business operations, (2) that this duress was sufficient to affect Wood's conduct toward executing a guarantee, (3) that the execution of the guarantee was compulsory or involuntary, and (4) that The Bank did not offer Wood any alternatives. These facts established the defense of duress or coercion, commonly called "economic compulsion."

Wood has established by clear and convincing evidence as a matter of law that The Bank exercised duress or coercion in obtaining Wood's guaranty.

Affirmed.

IT IS SO ORDERED.

WOOD, C. J., specially concurring.

HERNANDEZ, J., concurring in Chief Judge WOOD's special concurrence.

WOOD, Chief Judge (specially concurring):

I agree that the trial court properly directed a verdict in favor of Wood on the economic compulsion claim; I agree that the Bank gave Wood no alternative in requiring execution of the guaranty before renewing Wood's loan. The evidence is undisputed that if Wood did not execute the guaranty, the Bank would call the loan.

■ This special concurrence is directed to the Bank's claim that it had a legal right to require the guaranty. See *Terrel v. Duke City Lumber Company, Inc.*, 86 N.M. 405, supra, at 419, 524 P.2d 1021.

Pursuant to the written loan commitment, signed by the parties, Wood had a line of credit to the maximum amount of $500,000. Wood began borrowing money in 1971. The loan was reviewed and renewed every six months. Wood used the money in connection with his cattle operations. Because of the amount of the loan, the Bank did not expect the loan to be paid off when the six-month note matured. The ordinary procedure was that the note was renewed after a review of Wood's financial condition

and operations during the preceding six months.

In 1974, the cattle market was severely depressed, resulting in loss in value of the cattle securing the loan. In June, 1974, the Bank imposed conditions for renewal, including the sale of some assets in order to reduce the amount of the loan. These conditions were consistent with, and permissible under, the written agreement of the parties. Wood met those conditions. Nevertheless, the Bank refused to renew the loan unless Wood also executed the agreement which guaranteed $20,000 of the son's indebtedness, for which Wood was not liable. There is nothing in the written loan commitment which gave the Bank the legal right to require the guaranty as a condition for renewing the loan, and there is nothing in the trial testimony that supports such a legal right. The Bank added the guaranty requirement without any legal right to do so.

HERNANDEZ, J., concurs.