ELECTRICAL PRODUCTS CO. OF NEW MEXICO, INC., Plaintiff,

v.

COMBINED COMMUNICATIONS CORPORATION, Defendant.

Civ. No. 80–016 HB.

United States District Court, D. New Mexico.

Dec. 9, 1980.

Elvin Kanter, Willard F. Kitts, Elizabeth E. Whitefield, Albuquerque, N. M., for plaintiff.

Jonathan W. Hewes, Gene C. Walton, James C. Ritchie, Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, N. M., for defendant.

## MEMORANDUM OPINION

BRATTON, Chief Judge.

This case arises in the aftermath of two contractual transactions between the parties. Trial on the merits has been heard by the Court, and this Memorandum Opinion shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

In 1976, a division of defendant Combined Communications Corporation (CCC) called Electrical Products Signs, Inc., (EPSI) was engaged in the electrical sign business in New Mexico. Lionel Specter was general manager of EPSI.

The electrical sign business involves the manufacture, sale, and maintenance of electrically illuminated signs that advertise or identify business establishments. Many businesses find it economically burdensome to purchase electrical signs outright, so a system of leasing has developed in the industry under which customers lease signs from the manufacturer and pay, over the period of the lease, rent adequate to compensate the manufacturer for the cost of producing the sign, maintaining it, and financing the lease. Some profit is also derived from the rental. At the end of the

lease period, the sign is removed unless the customer elects to renew the lease or purchase the sign. Because a sign has essentially been paid for during the initial lease, rent payments from lease renewals form an important element of profit in the electrical sign industry.

CCC desired to phase out its electrical sign operations in New Mexico. Specter and some associates were interested in purchasing this part of CCC's business and operating it independently of the parent corporation. Specter lacked capital to purchase the entire operation at once, so a scheme was devised under which it was contemplated that part of the assets of EPSI would be transferred to Specter's group immediately, while the remainder could be acquired over time. Accordingly, Specter's group formed Electrical Products Company of New Mexico (EPCO), the plaintiff in this case, and in May of 1976 CCC and EPCO entered into their first agreement (the 1976 Agreement). Under this agreement, EPCO purchased the real estate, supplies, and equipment of EPSI. CCC retained ownership of the signs themselves and of all lease arrangements with its customers. Paragraph 15 of the agreement further provided:

(i) *Lease Contracts*—.... Buyer [EPCO] agrees to perform all the service as may be required under the terms of the specific lease contracts in consideration for the monthly payment by Seller [CCC] of 25% of the gross current monthly billing. At the end of the term of any lease contract, Buyer will negotiate for the renewal of the lease contracts, and, if renewed thereupon, pay to Seller a sum equal to 25% of the aggregate rentals for the entire renewal period at the time of such renewal for the purchase of said lease contract and the display covered by it.

Thus EPCO could anticipate a gradual takeover, through renewal and purchase, of most of the signs and leases retained by CCC, which constituted a substantial portion of the Albuquerque market.

Both parties began to operate under the 1976 Agreement: EPCO performed maintenance on leased signs and received payments from CCC; EPCO also renewed leases with CCC's customers and, after paying 25 percent of the anticipated rentals to CCC, assumed ownership of the signs and leases involved. EPCO departed from the usual industry practice of renewing leases for a three- to five-year period and renewed the CCC leases for a one-year term. In this way it was able to purchase the renewed leases and associated signs from CCC with a smaller capital outlay than if the leases had been renewed for the customary term. CCC did not challenge this practice; indeed, neither party questioned the adequacy of the other's performance.

In the summer of 1978, Jeff Lawlis, operating through Lenox Investments, Inc., became interested in purchasing the signs and leases still owned by CCC. Under the 1976 Agreement, CCC was free to make such a sale.

Lawlis was unaware that the 1976 Agreement gave EPCO rights relating to maintenance of the signs and renewal of the leases. Several months of negotiations between Lawlis and CCC culminated in mid-August of 1978 with an offer by Lawlis to purchase the signs and leases for $325,000. Throughout the negotiations, Lawlis was never informed by CCC of the terms of the 1976 Agreement; he believed CCC could transfer unrestricted ownership of the signs and leases to him.

While negotiating with Lawlis, CCC's officers resolved to offer EPCO a right of first refusal to purchase the signs and leases on the terms offered by Lawlis, although CCC was not required to do so. Consequently, CCC's vice president and assistant counsel, Quinn Williams, began communicating with EPCO by telephone and through the mail concerning the proposed sale.

On August 19, 1978, Williams sent Specter a letter informing him that a tentative offer had been made to CCC and requesting that EPCO refrain from negotiating lease renewals under the 1976 Agreement until

further notice. The letter also stated that CCC would offer EPCO a chance to match the offer if CCC should decide to accept it. On August 21, Williams wrote to Specter to inform him of the terms of Lawlis's offer and to extend formally a right of first refusal to EPCO.

Specter and his associates feared that a sale by CCC to a third party would undermine the 1976 Agreement. Their concern was aggravated by CCC, whose officers had decided as a deliberate strategy not to refer to the 1976 Agreement unless EPCO raised the issue. But Specter's group did not question CCC about the 1976 Agreement; instead they decided that EPCO should acquire the signs and leases that CCC planned to sell.

On August 23, 1978, EPCO exercised its right of first refusal, subject to its determination that a bona fide offer had in fact been made to CCC. Williams sent Specter a copy of Lawlis's written offer to CCC, with the offeror's name obliterated. "Lenox Investments" remained legible, however, and Specter was able to determine that Lawlis was the person behind the offer. Specter then arranged a bank loan for $325,000 and flew to Phoenix to consummate the deal. In Phoenix Specter met with Williams on September 1 and signed the second agreement between EPCO and CCC (the 1978 Agreement). At this meeting Specter first mentioned to Williams that he though EPCO was entitled to a price reduction because under the 1976 Agreement it already had some interest in the signs and leases. But when Williams asserted that he was not authorized to bargain at that time, Specter agreed to the price demanded.

Under the 1978 Agreement, EPCO paid $325,000 for CCC's remaining signs and leases, receiving CCC's entire interest in them and assuming all of CCC's obligations regarding them. Immediately after the agreement was executed, the parties stopped making payments to each other under the 1976 Agreement. Fifteen months later, EPCO filed this suit.

EPCO set forth three counts in its complaint. First, it alleged that CCC breached the 1976 Agreement by failing to make the maintenance payments called for in that agreement once the 1978 Agreement took effect. Second, it alleged that the 1978 Agreement was the product of economic duress and that EPCO was forced to pay an excessive price for the signs and leases in order to avoid being ruined by a sale to Lawlis. Third, it alleged that the 1978 Agreement was induced by CCC's fraudulent misrepresentation of its intent to sell the signs and leases to Lawlis for $325,000. On the evidence presented at trial, it is concluded that EPCO cannot prevail on any of its claims.

■ EPCO's breach of contract claim is easily disposed of. The evidence shows that both parties intended the 1978 Agreement to supersede the 1976 Agreement. This intent is most clearly shown by the behavior of the parties: each stopped paying the other under the 1976 Agreement as soon as the 1978 Agreement was made, and neither objected to the cessation of payments until EPCO belatedly raised the issue in this suit.

. But the parties' intent also appears in the 1978 Agreement itself. It provides for a complete transfer of CCC's rights and obligations in the signs and leases to EPCO. If the 1976 Agreement remained in effect, EPCO would be in the nonsensical position of having to pay itself the sums due under that contract. Further, one section of the 1978 Agreement provided for CCC to continue to pay EPCO for some sign maintenance under the 1976 Agreement after the date of the new agreement.[1] This provision would have been unnecessary had the 1976 Agreement been intended to continue in force. Since the parties intended the 1978 Agreement to supersede the 1976 Agreement, EPCO cannot recover on its claim that the earlier agreement was breached after the later one was executed.

■ Under New Mexico law, economic duress is analyzed as a tort. In order to

---

1. EPCO does not claim that CCC failed to make these payments.

recover damages, a plaintiff must show that the defendant had a duty to present him with a reasonable choice of bargaining alternatives, that the defendant breached that duty, and that the defendant's breach caused the plaintiff to enter into an unfavorable bargain against his will. *Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 524 P.2d 1021 (Ct.App.1974), *rev'd in part on other grounds*, 88 N.M. 299, 540 P.2d 229 (1975). Each of these elements must be proved by clear and convincing evidence. *Id.* EPCO has not met its burden of proof with regard to any element.

■ In an economic duress case, the duty to present reasonable alternatives arises when the defendant stands in a superior bargaining position to the plaintiff. But a mere disparity in size or bargaining power is not sufficient to create this duty; in general, every businessman is free to drive the hardest bargain he can. Only when the defendant holds the power to deal a fatal, or at least a very severe, economic injury to the plaintiff will he be constrained by the law of economic duress from abusing that power. *See Pecos Construction Co. v. Mortgage Investment Co. of El Paso*, 80 N.M. 680, 459 P.2d 842 (1969); *First National Bank in Clayton v. Wood*, 93 N.M. 467, 601 P.2d 437 (Ct.App.1979); *Terrel v. Duke City Lumber Co.*

■ CCC did not have the necessary power over EPCO. CCC's leases did constitute a significant portion of the Albuquerque market, and EPCO always hoped ultimately to acquire as many of these leases as possible. But EPCO had been acquiring leases from CCC for two years under the 1976 Agreement and had developed additional business independent of that derived from CCC. EPCO did not establish that its survival would be seriously threatened by an inability to acquire further CCC leases. Nor was it even established that a sale to Lawlis would have destroyed EPCO's rights under the 1976 Agreement. In the event of such a sale, EPCO may have had rights against CCC, Lawlis, or both.

■ Even if a duty to present reasonable alternatives were present in this case, EPCO did not show that CCC breached that duty. EPCO claims that CCC exerted duress by threatening to sell its signs and leases to Lawlis unless EPCO chose to purchase them. Yet CCC had the right to sell this property at any time, and it was not obligated to offer EPCO a right of first refusal. If CCC had sold the signs and leases to Lawlis without notice to EPCO, EPCO could not have complained. The fact that CCC voluntarily offered EPCO a chance to intervene in the transaction does not alter the conclusion that CCC's "threat" was merely to do what it had a legal right to do. Such conduct is not a breach of duty and cannot amount to economic duress. *See First National Bank in Clayton v. Wood*, 93 N.M. at 469–70, 601 P.2d at 439–40 (Wood, C. J., concurring).

■ EPCO claims that CCC actually threatened more than a sale—it threatened to breach the 1976 Agreement. Even if this claim were established, a threat to breach a contract generally does not constitute duress. *See* D. Dobbs, Remedies at 666 (1973). EPCO argues that duress should be found because Specter believed he was faced with the choice of buying the signs and leases at CCC's price or being ruined by a sale to Lawlis and a breach of the 1976 Agreement. But this was not the bare choice that EPCO faced. If the threatened injury appeared severe, EPCO could have sought injunctive relief, and if the sale to Lawlis ultimately did undermine EPCO's rights under the 1976 Agreement, EPCO could have sued for damages. Where New Mexico courts have found economic duress, they have done so only when legal remedies would not have alleviated the coercion or cured the harm. *See Pecos Construction Co. v. Mortgage Investment Co. of El Paso; Terrel v. Duke City Lumber Co.*

What is more, Specter knew EPCO had rights under the 1976 Agreement, yet he failed to make any reasonable effort to protect them in the event of a sale of Lawlis. He did not contact Lawlis after discovering his identity; nor did he request

or require CCC to advise Lawlis of EPCO's rights. Lawlis thought he was buying unrestricted rights to CCC's signs and leases. It was established that no reasonable buyer in the industry would purchase the qualified rights that CCC had to sell for $325,-000. By contacting Lawlis and advising him of EPCO's rights, Specter might have stopped the threatened sale or assured that it would be carried out at a lesser price and would be subject to EPCO's rights. If Specter himself wanted to buy the signs and leases from CCC, he could have attempted to use EPCO's potential power to prevent the CCC-Lawlis deal from going through to obtain price concessions from CCC. Yet he asserted EPCO's rights most ineffectively, waiting until the last phase of his negotiations with Williams and then yielding at once when Williams indicated he had no authority to negotiate. In a recent New Mexico case, the party successfully claiming economic duress tried to obtain essential financing elsewhere before agreeing to the coerced terms. *First National Bank in Clayton v. Wood.* Here EPCO did not make a reasonable effort to protect itself and cannot claim that it lacked opportunities to do so.

Finally, even assuming that a duty existed and a breach occurred, EPCO did not show that CCC's breach of duty caused EPCO to enter into the 1978 Agreement. In ordinary economic duress cases, the bargain made is so unfavorable to one party that there is no reason for that party to have agreed to it in the absence of duress. *See Pecos Construction Co. v. Mortgage Investment Co. of El Paso; First National Bank in Clayton v. Wood; Terrel v. Duke City Lumber Co.* But here EPCO could have considered CCC's offer advantageous and worth accepting on its own terms.

■ Specter asserted that the $325,000 price was outrageously high, far exceeding the industry standard of 40 percent of the unmatured value of the leases sold, but since he hardly quarreled with CCC over the price, it is difficult to accept his later protestations at face value. The price was satisfactory to Lawlis, an investor interested in making a profit from the leases, and it must have appeared at least reasonable to Spector's bank, which reviewed the proposed purchase before lending EPCO the money to make the deal. The price may have been higher than usual, but a substantial share of the Albuquerque market was conveyed. EPCO justifiably claims it would have been fair for it to have received a price reduction because of its prior rights under the 1976 Agreement. However, Specter's failure to make a reasonable effort to protect EPCO's position precludes a claim based on the price paid. Overall, EPCO appears to have benefitted from the transaction: it got full, immediate ownership of the signs and leases rather than a lesser interest in them; it became entitled to all the income derived from the lease billings rather than merely 25 percent; it was able to renew leases without having to pay out substantial capital to purchase the leases from CCC; and, since it no longer had reason to renew leases only for a short term to minimize capital outflow, it could secure its position in the market, and secure the flow of lease income, for a longer period of time.

To summarize the disposition of EPCO's economic duress claim, EPCO cannot recover because the transaction at issue lacks the earmarks of economic duress. CCC did not have the superior position necessary to exert duress on EPCO. CCC did not present EPCO only with unreasonable bargaining alternatives. There is insufficient indication that EPCO signed the 1978 Agreement against its will to avoid grievous loss. EPCO complains because it did not bargain hard enough to obtain the most advantageous price. Having failed to assert its rights at the bargaining table, it cannot now press them in court.

■ With respect to the claim for fraudulent misrepresentation, EPCO cannot prevail because it did not establish all the necessary elements of its case. CCC did misrepresent the amount it expected to receive from Lawlis for the signs and leases. CCC never revealed to Lawlis the existence of EPCO's rights under the 1976 Agree-

ment, and when Lawlis bid $325,000 for the signs and leases, he assumed he was purchasing unrestricted rights in the property. CCC knew that Lawlis would not pay this amount for signs and leases subject to EPCO's rights, and that CCC would either have to reduce the price to Lawlis or use some of the sale proceeds to buy out EPCO's interests.

But EPCO did not rely on CCC's misrepresentation. Specter, too, knew of EPCO's rights and knew that they should reduce CCC's net proceeds from the sale. Indeed, Specter sought a price adjustment from CCC in recognition of EPCO's rights under the 1976 Agreement. When Specter yielded in the negotiations, it was not in reliance on CCC's representation that Lawlis would pay $325,000, but rather in reliance on Williams' quite accurate representation that he did not want to bargain over the price.

EPCO argues further that it relied not merely on CCC's representation of the selling price but on CCC's representation that it intended, if EPCO did not exercise its right of first refusal, to sell the signs and leases to Lawlis free and clear of EPCO's rights under the 1976 Agreement, thus doing sever damage to EPCO. This is essentially the economic duress argument all over again, converted to a claim of fraudulent misrepresentation by conceding that CCC would not have done what EPCO claims was threatened.

There is no evidence, however, that CCC ever made such a threat. Specter jumped to the conclusion that CCC was threatening a breach when he received notice from CCC of the proposed sale to Lawlis. He had no reasonable ground for doing so. For instance, according to Specter CCC's request that EPCO temporarily refrain from lease renewals convinced him that CCC intended not to honor the 1976 Agreement, but CCC could have made that request simply to make the leases that were to be transferred readily identifiable.

■ Specter's conclusion was especially unreasonable, and he had no right to rely upon it, when he failed to take the most obvious preliminary step of contacting CCC's officers and asking what their intentions were with regard to the 1976 Agreement if the sale to Lawlis should go through. CCC did not deal forthrightly with EPCO in deciding not to mention EPCO's rights under the 1976 Agreement unless EPCO did, but this conduct does not amount to fraud.

Since EPCO has not proved any of its claims, a judgment will be entered dismissing this action and awarding costs to the defendant.